NOT DESIGNATED FOR PUBLICATION

No. 122,561

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of D.M. and J.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed September 11, 2020. Affirmed in part and dismissed in part.

*Richard P. Klein*, of Olathe, for appellant.

*Jacob M. Gontesky*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before BUSER, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM: T.M. (Father) appeals the district court's judgment finding him unfit as a parent and ruling that it was in the best interests of his children, D.M. and J.S., to establish a permanent custodianship. Upon our review, we hold the district court's finding of parental unfitness is supported by clear and convincing evidence and that we do not have jurisdiction to review the district court's conclusion that a permanent custodianship should be established for the children. Accordingly, we affirm in part and dismiss in part.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2019, the State filed child in need of care petitions for D.M. and J.S. based on allegations of inadequate parental care and physical, mental, or emotional abuse or neglect. D.M., who was born in 2012, was 6 years old at the time, and J.S., who was

1

born in 2003, was 15 years old. Father was incarcerated in Oklahoma at the time of the filing. Shortly thereafter, the district court adjudicated the children in need of care. Mother, who did not contest the petition, attended the hearing. Father did not attend.

In July 2019, the State moved to terminate the parental rights of Mother and Father. A termination trial was held in November 2019. Prior to the trial, Mother consented to a permanent custodianship for the children which the district court accepted. As a result, Mother is not a party to this appeal.

Several witnesses appeared at the termination trial—Father, Felicity Crossland, a KVC case manager assigned to facilitate the reintegration of the family, and the children's maternal grandmother, J.M., who was caring for them with court approval. Father appeared at the trial by telephone.

Father testified that he began living with Mother in Johnson County in 2005. At that time, Father was working as a certified nursing assistant at a nursing home. In 2010, Father, Mother, and J.S. moved to Oklahoma to take care of his mother. Later, Father and Mother married and D.M. was born in 2012.

While Father resided in Oklahoma, court records memorialized that Father pled guilty in three felony drug cases during 2015 and 2016. His convictions included three counts of unlawful possession of a controlled drug with the intent to distribute; two counts of possession of drug paraphernalia; one count of obstructing an officer; and one count of carrying a weapon. Father received a suspended sentence and was placed on probation.

In 2015 or 2016, Mother and the children moved back to Kansas, and Father recalled traveling to the Kansas City area to visit them on one occasion.

Father testified that he continued to use and sell methamphetamine in Oklahoma while he was on probation which resulted in new criminal charges. On June 4, 2018, Father's probation was revoked in all three cases and he was committed to the Oklahoma Department of Corrections to serve a controlling 12-year prison term. Father testified that as of the date of the termination trial he had served about 1 1/2 years towards completion of the 12-year sentence.

According to Father, he is eligible for release to a halfway house in May 2020 and parole in 2021. Father testified that he had completed several programs while incarcerated, including over 300 hours of substance abuse, parenting, and offender reformation programs. Father submitted in evidence certificates to show successful completion of these programs. He testified that while incarcerated he was employed, helped other inmates address their substance abuse problems, and had not been disciplined. As a result, while acknowledging that he had received no assurances, Father believed he would be released from prison in the summer of 2020.

Father testified that upon his release, he believed D.M. and J.S. could visit him in Oklahoma at the halfway house, but he could not go to Kansas until he was on parole. Father later testified that the halfway house would not be an appropriate environment for the children to stay in and "they wouldn't be allowed to do that anyway." Father believed he could call his children at any time with the permission of his caseworker.

Father testified to an extensive history of illegal drug use and crime. He was convicted of second-degree robbery in Missouri which resulted in his incarceration from 1988 to 1990. Father testified to a burglary charge in 2006 in Johnson County. At that time, he admitted using crack cocaine which he had started using "a long time ago" when he was young. In 2010 when he moved to Oklahoma, Father began using crystal methamphetamine on a regular and daily basis, in addition to using marijuana and alcohol. Father testified that he stopped using crack cocaine when he went to prison in

Oklahoma. According to Father, he completed drug treatment programs in the past, but those programs were not as intensive as his current program. As a result, Father believed he was better equipped to handle the triggers that caused his illegal drug use.

Father testified that J.S. had been living with him beginning in 2005, and D.M. had been living with Father since her birth in 2012. Father believed his children knew him and that he was bonded with them. According to Father, he wrote letters to his children while in prison, but he found it easier to write letters to them before they were placed in State custody. Father knew D.M. was in first grade and that she repeated kindergarten, but he was unaware that she had been recently been diagnosed with a learning disability. Father acknowledged that the last time he had seen his children was either in 2016 or 2017.

Father and Mother were still married and upon his release from prison, Father "plan[ned] to try to work things out and see where our relationship goes." He characterized his relationship with Mother as "okay."

Crossland, the KVC case manager for the family from April 2019 to October 2019, testified that KVC never offered Father a reintegration plan because KVC was unable to regularly contact him while he was incarcerated. Crossland sent Father multiple letters between June and October 2019, but he never responded. According to Crossland, Father called her once in July 2019 after being served with court papers. Father called her a second time to see if she had received a letter addressed to D.M.

Crossland opined that it was not in the children's best interests to wait until Father was possibly released to a halfway house in May 2020, nor to give him a reintegration plan that would culminate upon any parole in 2021. Crossland reasoned that J.S. was already close to 17 years of age and by that time he would be an adult. Crossland testified that it was in the children's best interests to proceed with a permanent custodianship with

4

J.M., their maternal grandmother and current placement, rather than terminate parental rights for Mother. Crossland did not testify about whether she favored establishment of a permanent custodianship or termination of Father's parental rights.

J.M. testified that prior to being placed in state custody, J.S. had been living with her for six months. Moreover, D.M. had been living with an aunt prior to the filing of the child in need of care case. Later, D.M. and J.S. resided together under the care of J.M. While the children were in her care, J.M. never received letters or birthday cards for the children from Father, nor has he provided financial support or contacted J.M. J.M. testified that Father's brother contacted her twice on Father's behalf to ask how the children were doing. J.M. testified that she is not sure that D.M. would recognize her Father, although she sometimes mentioned him. As for J.S., she stated that he "hasn't mentioned [Father] at all."

The district court took the matter under advisement before issuing an oral ruling at a hearing in January 2020. The district court found by clear and convincing evidence that Father was unfit as a parent under three statutory provisions:  K.S.A. 2019 Supp. 38-2269(b)(5), (b)(8), and (c)(2). As discussed more fully in the analysis section of this opinion, the district court's findings highlighted that reintegration would not be possible for "a considerable amount of time with no guarantee that [Father] is going to be released [from prison] in May of this year or in 2021 if he is eligible for parole." Moreover, because of his incarceration, Father had failed to maintain a parental relationship for a significant period of time.

The district court also found by clear and convincing evidence that the conditions of parental unfitness were unlikely to change in the foreseeable future based upon Father's incarceration and his long history of not maintaining regular visitation with his children. Lastly, the district court ruled that it was in the best interests of the children for

5

the court to establish a permanent custodianship rather than terminate Father's parental rights.

Father appeals, contending the district court's findings of unfitness were not supported by clear and convincing evidence, and that establishing a permanent custodianship did not serve the children's best interests. These two issues will be separately addressed.

BRIEF SUMMARY OF RELEVANT KANSAS LAW AND STANDARDS OF REVIEW

We begin the analysis by briefly summarizing Kansas law governing proceedings under the revised Kansas Code for Care of Children, K.S.A. 2019 Supp. 38-2201 et seq. A person has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). This right is a constitutionally protected liberty interest. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of the Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). As a result, the State may extinguish the legal bond between a parent and child only upon clear and convincing proof of parental unfitness consistent with the best interests of the child. K.S.A. 2019 Supp. 38-2269(a), (g); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

After a child has been adjudicated in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

6

K.S.A. 2019 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply the factors set forth in K.S.A. 2019 Supp. 38-2269(b) and, when the child has been removed from the home, the additional factors in K.S.A. 2019 Supp. 38-2269(c). A single factor is enough to establish parental unfitness. See K.S.A. 2019 Supp. 38-2269(f).

In evaluating the likelihood of change in the foreseeable future under K.S.A. 2019 Supp. 38-2269(a), the courts should use "child time" as the measure. K.S.A. 2019 Supp. 38-2201(b)(4); see *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

When a parent challenges the sufficiency of the evidence supporting a decision to terminate the parent's rights, an appellate court will uphold the decision if, after reviewing the record evidence in a light most favorable to the State as the prevailing party, the district court's findings on unfitness and foreseeability of change are supported by clear and convincing evidence. Stated another way, the appellate court must be persuaded that a rational fact-finder could have found it highly probable that the circumstances warrant the termination of parental rights. *In re B.D.-Y.*, 286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

Courts assess a child's best interests by a different standard from unfitness or unlikelihood of change. As provided by K.S.A. 2019 Supp. 38-2269(g)(1), the district court shall give "primary consideration to the physical, mental[,] and emotional health of the child" in making a best interests determination. This assessment balances the negative effects of termination on the child with the benefits of "permanency" in a different home environment. A district court decides best interests based on a preponderance of the

evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The decision rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1115-16.

An appellate court reviews the district court's best interest findings for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

DISTRICT COURT'S FINDINGS OF PARENTAL UNFITNESS

Having briefly summarized the relevant Kansas law and our standards of review, we will consider Father's first issue—whether there was sufficient evidence to support the district court's conclusion that he was unfit to parent D.M. and J.S. The district court found three statutory factors applied in establishing Father's parental unfitness:

- Felony conviction and imprisonment under K.S.A. 2019 Supp. 38-2269(b)(5);
- "[L]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child" under K.S.A. 2019 Supp. 38-2269(b)(8); and
- "[F]ailure to maintain regular visitation, contact or communication with the child or with the custodian of the child" under K.S.A. 2019 Supp. 38-2269(c)(2).

Each factor is separately analyzed below.

*Felony Conviction and Imprisonment (K.S.A. 2019 Supp. 38-2269[b][5]).*

Father asserts the district court erred in finding that he was unfit because of a felony conviction which resulted in imprisonment. While not contesting his felony convictions and lengthy prison sentence, Father claims the district court did not consider that he had made reasonable attempts to contact and maintain a relationship with his children while in prison.

In ruling that Father was unfit to parent based on this statutory factor, the district court stated:

> "He has been convicted of a felony and is currently imprisoned in Oklahoma. His original sentence was a 45-year sentence. He was briefly released and then was reincarcerated. He testified that he would be eligible for release to a halfway house in May of this year. He then testified that he is eligible for parole sometime in 2021. His original sentence once he was returned to prison in Oklahoma after violating the terms of his parole was at least a decade long.
> "Even if the children could be reintegrated with their father, they would not be able to be reintegrated at a halfway house. There would be a considerable amount of time with no guarantee that he is going to be released in May of this year or in 2021 if he is eligible for parole. There is no guarantee that he would be in a position to care for the children for a significant period of time. We are talking at least—at least nine to 12 months."

As detailed in the factual and procedural background, during these proceedings Father had been imprisoned in Oklahoma for multiple drug-related felonies. As of the termination trial, Father had only served 1 1/2 years of his controlling 12-year sentence. This criminal history information was proven by Father and the admission of court documents memorializing the felonies and controlling sentence.

Father claims that, in considering this statutory factor, the district court did not account for his efforts to maintain an ongoing relationship with his children while imprisoned. Father's contention lacks merit.

First, "under Kansas law, simply committing a felony and being imprisoned can constitute the sole basis for a finding of unfitness, regardless of the circumstances of the crime." *In re M.H.*, 50 Kan. App. 2d at 1171-72; see *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018) ("[I]mprisonment for a felony alone can result in termination."). Nothing more than proof of the commission of a felony and incarceration is required to prove unfitness under K.S.A. 2019 Supp. 38-2269(b)(5).

Second, as we discuss later in the opinion regarding the third statutory factor, K.S.A. 2019 Supp. 38-2269(c)(2), there was clear and convincing evidence that Father did not maintain an ongoing relationship with his children while in prison. As a result, even if, as Father argues, this statutory factor included whether Father had a positive relationship with his children while in prison, that parental relationship did not exist in this case. Father has not shown that the district court erred in finding Father unfit to parent D.M. and J.S. under K.S.A. 2019 Supp. 38-2269(b)(5).

Viewing the evidence in the light most favorable to the State, we are convinced a rational fact-finder could find by clear and convincing evidence that Father was unfit because of his felony convictions and incarceration.

*Lack of Effort on the Part of the Parent to Adjust the Parent's Circumstances, Conduct, or Conditions to Meet the Needs of the Child (K.S.A. 2019 Supp. 38-2269[b][8]).*

The district court also found that Father was unfit to parent under K.S.A. 2019 Supp. 38-2269(b)(8), specifically the "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Father

challenges this finding by emphasizing the evidence that he has made progress towards rehabilitation while in prison. Father highlights his completion of substance abuse programs, offender reformation programs, and parenting classes while in prison.

As detailed earlier, Father testified to a long and serious history of illegal drug abuse and crime. Of particular concern, however, is that that while he was on probation for multiple and serious drug offenses beginning in 2016, Father continued to use and sell illegal drugs. During this same time period, while Father remained in Oklahoma, Mother, D.M. and J.S. returned to Kansas. At trial, Father admitted that during this period he only saw his children on a weekend visit in either 2016 or 2017. Ultimately, Father's continued sale of illegal drugs resulted in yet another conviction, and revocation of his probation on June 4, 2018. The bottom line is: As of the date of the termination trial, Father had only seen his children on one weekend in the prior two or three years.

We are persuaded that this evidence was clear and convincing proof that in recent years Father placed more importance on the use and sale of illegal drugs than in parenting his children. Rather than altering his illegal conduct to meet the needs of his children living in Kansas, Father continued to use and sell illegal drugs in Oklahoma, which resulted in imposition of a significantly long term of imprisonment and additional years for which D.M. and J.S. were without their Father. Viewing this evidence in the light most favorable to the State, we are convinced a rational fact-finder could find by clear and convincing evidence that Father was unfit because he failed to adjust his circumstances, conduct, or conditions to meet the needs of his children.

*Failure to Maintain Regular Visitation, Contact, or Communication With the Child or With the Custodian of the Child (K.S.A. 2019 Supp. 38-2269[c][2]).*

The district court's third statutory basis for finding that Father was unfit as a parent was provided under K.S.A. 2019 Supp. 38-2269(c)(2). This factor relates to Father's

11

"[f]ailure to maintain regular visitation, contact or communication with the child or with the custodian of the child," while the child is not in the physical custody of the parent. According to the district court:

> "He is incarcerated. He has failed to maintain a relationship with his children. He has not provided—he testified that he has made attempts to send cards and letters but the children have not received those. He has not called his children. He has not maintained a relationship with his children in a significant period of time."

In support of his contention, Father reprises the arguments and evidence that he discussed earlier in the context of K.S.A. 2019 Supp. 38-2269(b)(5). In addition to claiming that he attempted to engage with his children while incarcerated, Father points out that he knew details about the children's schooling, extracurricular activities, and birth dates. Father testified that his children knew him and had bonded with him. According to Father, he wrote letters to his children while in prison, but he found it easier to write letters to them before they were placed in State custody.

Father's testimony was controverted however, by the children's grandmother and KVC caseworker. While the children have been in her care, J.M. testified that she never received any letters or birthday cards from Father mailed to his children. For her part, J.M. had no contact or financial support from Father, although Father's brother had contacted her twice on Father's behalf to inquire about the children. J.M. reported that although D.M. sometimes mentioned Father, J.S. had not. For her part, Crossland testified that on one occasion Father called her to see if she had received a letter addressed to D.M. This evidence suggests only sporadic and infrequent communication between Father and his children.

Importantly, the record also shows that Father had minimal personal visits or contacts with his children or their custodian. As discussed in the previous section, Father

12

testified that the last time he had seen his children was in 2016 or 2017, in part due to his latest incarceration beginning on June 4, 2018. One weekend visit with his children over a two- or three-year period clearly does not constitute the regular contact required under K.S.A. 2019 Supp. 38-2269(c)(2).

Mindful of the difficulties in contacting the outside world inherent in Father's imprisonment, we are still persuaded that Father's efforts in maintaining regular visitation, contact, or communication with D.M., J.S., or J.M. were insufficient for meeting the requirements of K.S.A. 2019 Supp. 38-2269(c)(2). See *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002) (noting that a parent's lack of contact or support while incarcerated would not be excused because "these activities would not necessarily have been prohibited by . . . prison time").

Viewing the evidence in the light most favorable to the State, we are convinced a rational fact-finder could find by clear and convincing evidence that Father was unfit as a parent due to his failure to maintain regular visitation, contact, or communication with the children or their custodian.

LIKELIHOOD OF CHANGE IN THE FORESEEABLE FUTURE

Having established that clear and convincing evidence supports the district court's three individual findings of unfitness, we next consider whether the district court erred in concluding that Father's unfitness was unlikely to change in the foreseeable future. See K.S.A. 2019 Supp. 38-2269(a).

Father contends:

"Even if the district court was correct in finding [Father] unfit, its prediction regarding the foreseeable future ignores the clear progress [Father] made while in prison

13

to put the pieces in place to make him successful when he is released. And it further ignores the efforts [Father] made to maintain contact with his children."

The State counters that Father's long history of criminal conduct and illegal drug use strongly suggest that he will not change his behavior in the foreseeable future. Moreover, the State argues there is little evidence to show that Father's prior lack of regular contacts and communication with D.M. and J.S. will change over time. According to the State, even by Father's estimate, he would be unable to reintegrate with his children until some day in 2021 which would not constitute the foreseeable future in child time.

The district court reasoned:

"The Court finds that these conditions of unfitness as outlined by the Court are unlikely to change in the immediate or foreseeable future based upon the length of duration of the incarceration and the long history of his lack of effort to maintain a relationship and his long effort—his long history of not visiting the children or maintaining regular visitation with them."

We are convinced that clear and convincing evidence supports the district court's conclusion that Father's unfitness was unlikely to change for the better in the foreseeable future. At the time of trial, Father had served only 1 1/2 years of a 12-year sentence. Although Father testified to his eligibility for living in a halfway house in 2020 and possible parole in 2021, he conceded that he had received no assurances this timetable would become a reality.

Moreover, D.M. and J.S. were removed from the home in January 2019. Assuming Father would be paroled in 2021, the children would have been in out-of-home placement for two to three years before Father's parole and his attempt at reintegration. See *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001) (concluding that mother's continued imprisonment that required children to be in out-of-home placement for at least 30

months was not in the foreseeable future). Under the circumstances of this case, two to three years is too long a period of time to effectuate reintegration.

Additionally, assuming Father's timetable became a reality, J.S. could already be an adult by the time Father is released from prison. Regarding D.M., she had spent most of her life without Father's parenting, so in terms of "child time," the additional two to three years would be a very long time to wait to affect a permanent parenting disposition. As Kansas law provides, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that difference in perception typically tilts toward a prompt, permanent disposition. K.S.A. 2019 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

Finally, as detailed in the prior sections, we agree with the district court that Father's history of longstanding illegal drug use and criminal conduct does not bode well for a future change in behavior. His past failures to maintain regular visitation, contact, or communication with his children also strongly indicate that this aspect of his parental unfitness will not change in the foreseeable future. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); see *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App.) (unpublished opinion) ("Parental unfitness can be judicially predicted from a parent's past history.").

In summary, viewing the evidence in the light most favorable to the State, we are convinced a rational fact-finder could find by clear and convincing evidence that Father's parental unfitness is unlikely to change in the foreseeable future.

ESTABLISHMENT OF A PERMANENT CUSTODIANSHIP

Father next challenges the district court's decision to establish a permanent custodianship for the children. He asserts the district court failed to consider the physical,

15

mental, or emotional needs of the children thus, it was an abuse of discretion to order the creation of a permanent custodianship.

For its part, the State questions whether, since the district court did not order termination of parental rights, the district court was required to consider the best interests of D.M. and J.S. Alternatively, the State argues that the district court did, in fact, consider the best interests of the children in establishing the permanent custodianship.

Upon its finding that Father was unfit to parent D.M. and J.S., the district court ordered the establishment of a permanent custodianship:

> "The Court does find that it is in the best interests of the children for there to be created a permanent custodianship. I'm not terminating his parental rights. The Court does find that the creation of a permanent custodianship is in the children's best interest. Mother has consented to that creation, but with regard to the father, the Court further finds that is in their best interests as well."

At the outset, we question whether our court has jurisdiction to consider Father's appeal of the district court's ruling.

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017). An appellate court has a duty to question jurisdiction on its own initiative. When the record discloses a lack of jurisdiction, the appellate court must dismiss the appeal. *Wiechman v. Huddleston*, 304 Kan. 80, 84-85, 370 P.3d 1194 (2016).

The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statutes. *Wiechman*, 304 Kan. at 86-87.

16

The revised Kansas Code for Care of Children has a separate jurisdiction statute, K.S.A. 2019 Supp. 38-2273(a), which provides: "An appeal may be taken by any party or interested party from any order of temporary custody, adjudication, disposition, finding of unfitness or termination of parental rights." According to our Supreme Court, "[t]he statute creates five categories of appealable orders in a [child in need of care] case." *In re T.S.*, 308 Kan. 306, 310, 419 P.3d 1159 (2018).

In *In re T.S.*, the Supreme Court held that "any . . . order . . . of termination of parental rights" meant "an order that ends parental rights, and nothing more." 308 Kan. at 312. As a result, our Supreme Court dismissed a grandfather's cross-appeal of a district court ruling that appointed a permanent custodian rather than granting a motion to terminate parental rights. The Supreme Court reasoned that the plain language of the statute permitted an appeal of the termination of parental rights but not an appeal of the district court's *refusal* to terminate parental rights. 308 Kan. at 312. In this holding our Supreme Court specifically declined "to create a new category of [child in need of care] appeals where the Legislature has declined to do so." 308 Kan. at 312.

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). In analyzing a statute, we must first ascertain legislative intent thorough the statutory language enacted, giving common words their ordinary meanings. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

A plain reading of K.S.A. 2019 Supp. 38-2273(a), in concert with *In re T.S.*, yields the conclusion that the Legislature did not intend to provide Kansas appellate courts with jurisdiction to review a district court's ruling creating a permanent custodianship for children in need of care. Accordingly, this portion of Father's appeal is dismissed for lack of jurisdiction.

We pause to note, however, that while the district court specifically found the permanent custodianship was in the best interests of D.M. and J.S., the revised Kansas Code for Care of Children does not require such a finding to establish a permanent custodianship. K.S.A. 38-2269(g)(1) provides that "[if] the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." But "if the court does not terminate parental rights, the court may authorize appointment of a permanent custodian pursuant to K.S.A. 2019 Supp. 38-2272." K.S.A. 38-2269(g)(3). Moreover, K.S.A. 2019 Supp. 38-2272 pertaining to the appointment of a permanent custodian makes no reference to the necessity of the district court to make a best interests finding before establishing the permanent custodianship. In short, and contrary to Father's assertion, there is no statutory requirement for a district court to make a best interests finding prior to ordering the establishment of a permanent custodianship.

In conclusion, the clear and convincing evidence presented at the termination trial was sufficient to support the district court's findings that Father was unfit and his unfitness was unlikely to change in the foreseeable future. Moreover, we are without jurisdiction to consider Father's argument that the district court failed to consider the best interests of the children in the establishment of a permanent custodianship.

Affirmed in part and dismissed in part.